UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

GREGORY ROBERTS,

    Plaintiff,

v.                                    06-CV-3061

GREGORY FIRKUS, Warden,
LISA TREUTHART[1], Correctional Officer,
T. MILLER, Lieutenant,
C. MOORELAND, Correctional Officer,
NEWLYN, Correctional Officer,
HARPER, Correctional Officer
STEPHANIE GETTLEMAN, Correctional Officer
DENNIS COOPER, IDOC Chief of Staff
HOPKINS, Correctional Officer

    Defendants.

## Order

The plaintiff claims that the defendants retaliated against him for exercising his First Amendment rights by: issuing and upholding false disciplinary reports; making it difficult and unpleasant for the plaintiff's wife to visit him; and, by ultimately instituting permanent visitation restrictions between him and his wife. He also claims that the permanent visitation restrictions amounted to cruel and unusual punishment under the Eight Amendment. (Amended Complaint d/e 33). The case is before the court on the defendants' motion for summary judgment.

*Standard*

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Only disputes over facts

---

[1]This is the spelling used by Defendant Treuthart.

that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.  A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(e).  In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e).

*Undisputed Facts*[2]

1. The plaintiff is incarcerated in the Illinois Department of Corrections.  Olga Roberts is the plaintiff's wife.

2. The plaintiff was incarcerated at Logan Correctional Center from April 2003 until May 17, 2005.

3. On or about March 26, 2004, Mrs. Roberts was visiting the plaintiff at Logan Correctional Center.  The visit was terminated because Defendant Moreland, a correctional officer, reported observing them kissing at the table.  The plaintiff and Mrs. Roberts dispute that they were kissing at the table.

4. When she arrived home after her visit on March 26, 2004, Mrs. Roberts called Defendant Firkus to alert him to Defendant Moreland's alleged lies.  The conversation left Mrs. Roberts with the impression that Firkus did not believe her but instead believed Moreland's account.

5. On March 27, 2007, Defendant Moreland wrote a disciplinary report against the plaintiff charging him with abuse of privileges based on the table kissing incident.  This disciplinary report does not appear to be in the record, but the both parties' exhibits refer to it.  Mrs. Roberts asserts that Defendant Firkus had indicated to someone that a 30-day suspension on visiting privileges would be implemented, but there is no evidentiary support for this in the record, other than Mrs. Roberts' statement, which is inadmissible hearsay.

6. On March 29, 2004, Mrs. Roberts wrote to Roger Walker, alerting him to Defendant Moreland's purported lies about the table kissing, as well as recounting a host of other alleged indignities and harassment that Mrs. Roberts had endured when trying to visit her husband, reaching back to October 2003.  (d/e 33-2, p. 12).  The letter was copied to the plaintiff and to Defendant Sims, then the Warden of Logan Correctional Center.

---

[2]Some of the facts are adopted verbatim from the defendants' proposed facts, to the extent not disputed by the plaintiff.

7. On April 1, 2004, Defendant Sims authored a letter to Mrs. Roberts informing her that her visiting privileges had been revoked for three months because she had violated the rules by "exhibit[ing] inappropriate sexual behavior." (d/e 59-2, p. 4).

8. On April 14, 2004, Defendant Sims wrote another letter to Mrs. Roberts, this one in response to the letter she had written to Roger Walker. Defendant Sims took exception to the allegations that Mrs. Roberts had leveled against the staff at Logan. Sims further defended Officer Moreland's actions and character. Sims explained "We have very specific guidelines in regards to behavior in this setting, such as limits on the amount/type of embracing or touching allowed due in large part out of respect to those individuals who occupy this area (i.e. young children, grandparents, etc.), in addition to maintaining control within a penal facility." (d/e 56-3, p. 5).

9. On April 24, 2004, Mrs. Roberts e-mailed Roger Walker's personal secretary, again challenging Defendant Moreland's purported lies, the 90 day suspension of her visiting privileges, and Sims' alleged increase in the restriction from 30 to 90 days in retaliation. As stated earlier, though, there is no evidence that the restriction was ever 30 days.

10. On April 28, 2004, Defendant Cooper, IDOC Chief of Staff, wrote Mrs. Roberts in response to her April 24 e-mail to Walker's secretary. Mr. Cooper stated in that letter that "it is clear that there is a difference of opinion as to what the staff's version and what you perceive. . . ." Cooper sided with the prison staff's perception, but also reduced the visit restriction from 90 to 60 days. (d/e 59-2, p. 12).

11. About one year later, on April 28, 2005, Defendant Gettleman, a correctional officer at Logan, wrote a disciplinary report against the plaintiff charging him with abuse of privileges, violation of rules, and sexual misconduct during a visitation with his wife. Gettleman wrote that she had observed the plaintiff give his wife a hickey on the neck. Defendant Miller, the shift supervisor, checked the box on the report for "temporary confinement," giving the reason "threat to security." The plaintiff denied that the gave his wife a hickey, explaining to officials and ARB members that the red mark on his wife's neck was a bruise from where his wristwatch had accidentally struck her when he was trying to disentangle it from her hair after an initial hug.

12. Defendant Firkus, acting as Warden, sent a letter dated May 2, 2005 to Mrs. Roberts, stating that her visiting privileges at IDOC had been permanently revoked because she had exhibited inappropriate sexual behavior during the April 28, 2005 visit. The letter indicated that Mrs. Roberts could request the Warden to review the restriction after six months and on an annual basis thereafter. (d/e 33, p. 31). The plaintiff and Mrs. Roberts were still allowed to communicate through phone or by letter.

13. The Adjustment Committee heard the disciplinary report five days later, on May 3, 2005. The Adjustment Committee members were Defendants Allen and Treuthart. They found the plaintiff guilty on all counts, not buying his wristwatch defense, and recommended 3 months C grade, 3 months segregation, the revocation of 3 months good time credits, a

transfer, 3 months recreation restriction, and 6 Months contact visits restriction.[3]  Defendant Firkus approved the recommendation on May 5, 2005.  (d/e 56-3 pp. 9-11).

14.  On May 5, 2005, Mrs. Roberts wrote Governor Blagojevich about the permanent visitation restriction.  The letter also recounted additional indignities and harassment she had endured while trying to visit her husband, as well as alleged past injustices and unprofessional conduct by prison officials.  (d/e 33-4, p. 18).

15.  On May 12, 2005, Senator Larry Bomke wrote Roger Walker, asking him to look into the situation.  (d/e 33-4, p. 25).

16.  On May 15, 2005, the plaintiff was transferred out of Logan Correctional Center to Pinckneyville Correctional Center.  On July 22, 2005, the Administrative Review Board upheld the guilty findings of sexual misconduct and abuse of privileges.  (d/e 20, p. 10).  The Board deleted the rule violation charge.  *Id.*

17.  The record does not appear to show if the visitation restrictions were lifted at Pinckneyville or whether the plaintiff or his wife requested that they be lifted once the plaintiff was transferred to Pinckneyville.  The record does not show if Mrs. Roberts exercised her right to request reinstatement of visiting privileges after six months.

18.  The plaintiff is currently incarcerated in Taylorville Correctional Center.  There is no information about whether Mrs. Roberts can now visit the plaintiff.

*Analysis*

The defendants contend that the visitation restriction was placed on the plaintiff's wife and therefore the plaintiff does not have standing to challenge that restriction or pursue a retaliation claim based on that restriction.  Mrs. Roberts, however, was challenging the prison's actions on her behalf as well as on the plaintiff's behalf.  The two were acting in concert in pursuit of the same goal, restored visitation rights and a cessation of the alleged unprofessional behavior by prison officials.  The visitation restriction affected the plaintiff as much as it affected Mrs. Roberts, and the letters and complaint are attributable to the plaintiff as much as they are to Mrs. Roberst.  Accordingly, the court believes the plaintiff has standing to pursue this action.

Restricting visitation rights in retaliation for challenging prison conditions violates the right to petition the government for redress of grievances.  *Powers v. Snyder*, 484 F.3d 929, 933 (7th Cir. 2007).  "To succeed on a retaliation claim, the plaintiff must "establish that his protected

---

[3]The defendants assert that the April 28, 2005 incident was the plaintiff and his wife's fifth documented visiting room rule violation, but there is no foundation for that conclusion.  The only other documented incident in the record is the March 24, 2004 incident (kissing across the table).

4

conduct was a motivating factor behind [the defendants' actions], but that should not end the inquiry. Because the ultimate question is whether events would have transpired differently absent the retaliatory motive . . ." *Babcock v. White*, 102 F.3d 267, 275 (7th Cir. 1996). If the same action would have occurred regardless of the retaliatory motive, the claim fails. *See Spiegla v. Hull*, 371 F.3d 928, 942 (7th Cir. 2004). If a prison officer's actions are supported by legitimate penological concerns, the retaliation claim fails as a matter of law.

Here, there is no evidence that the defendants' actions were motivated by retaliation for any protected First Amendment activities by the plaintiff or his wife. Defendant Moreland's disciplinary report in 2004 was written before any of Mrs. Roberts' letters, and thus could not have been motivated by retaliation. The plaintiff asserts that Firkus increased the visitation restriction from 30 to 90 days in retaliation for those letters, but there is no evidence that the restriction was ever actually set at 30 days, as already stated above. As to the 2005 disciplinary report, there is no evidence that Defendant Gettleman (who wrote the ticket) or Defendant Miller (who placed the plaintiff in temporary confinement) were aware of Mrs. Roberts' letters when they took those actions.[4] Similarly, there is no evidence that the adjustment committee members were aware of the prior letters and complaints when they heard the ticket. Firkus did know about the letters and complaints, but all he did was uphold the committee members' recommendations, which were based on the committee's credibility determinations. The sole fact that he knew of prior letters is insufficient to warrant an inference of retaliation under those facts. In sum, the plaintiff's assertions that the defendants all conspired together to retaliate because of the complaints of the plaintiff and his wife are speculation.[5]

Further, the guilty finding resulting from that report cannot be challenged here, as discussed in prior orders, because the plaintiff lost good time. Challenges that "necessarily imply the invalidity of the deprivation of [an inmate's] good-time credits," are not cognizable under 42 U.S.C. § 1983 until the prison disciplinary decision has been invalidated. *Edwards v. Balisok*, 520 U.S. 641, 648 (1997). Thus, for purposes of this case, the plaintiff did give his wife a hickey. The 2005 report and subsequent punishment, then, was supported by a legitimate penological interest in enforcing and fostering adherence to prison rules.

---

[4]In any event, Miller's placement of the plaintiff in temporary confinement caused no injury because the plaintiff received three months of segregation as punishment anyway.

[5]The retaliation claims against Defendants Newlyn, Harper, Cooper, and Hopkins are even more vague and conclusory. Hopkins only responded to Mrs. Roberts' letter, siding with the prison on the perceptions of what had occurred. What the dispute came down to was who to believe, which involved a credibility determination. Believing the prison officials' account over Mrs. Moreland's does not alone give rise to an inference of retaliation in that instance. There must be something more. As to Defendants Newlyn, Harper, Cooper and Hopkins, it is not clear what adverse actions they even took against the plaintiff, beyond their alleged unprofessional behavior.

As to Firkus' implementation of the permanent visitation restriction, there is no evidence to conclude that he was motivated by retaliation, or even if he was, that he would have acted differently absent such motivation.  Firkus' restriction was based on legitimate penological reasons.  He avers that he instituted the permanent restriction because of the disciplinary charges, which included sexual misconduct and repeated visiting rule violations.  He avers that permanent restrictions can be instituted for charges of sexual misconduct and abuse of privileges and such is not uncommon pending investigation of charges.  The administrative regulations back him up. Permanent restrictions can be imposed for sexual misconduct and for "[a]ny recurrence of an action that previously resulted in a temporary restriction."  20 Ill. Admin. Code 525.60(g)(2) and (11).   The plaintiff was found guilty of sexual misconduct, the definition of which includes "touching done to sexually arouse."  20 Ill. Admin. Code 504, Table A, ¶ 107. There is no evidence that Firkus treated similar infractions by other visitors and inmates more leniently, which might allow an inference that the permanent visitation restriction would not have otherwise occurred.  There is no evidence that the reasons proffered by Firkus were pretextual.  The fact that he knew of the letters and complaint does not alone cast doubt on his reasons.  If that were the law, every adverse action taken by a prison official with knowledge of a prisoner's complaints would require a jury trial to determine motivation.

One might reasonably debate whether a hickey is really "sexual misconduct" serious enough to warrant a permanent visitation restriction, but the debate is not of constitutional import.  "We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).  Prison officials have a legitimate penological interest in preventing sexual contact between inmates and their visitors and in ensuring that visitation rules are followed.  See id. at 134 ("Withdrawing visitation privileges is a proper and even necessary management technique to induce compliance with the rules of inmate behavior . . . .)(upholding 2-year visitation restriction for inmates with two substance abuse violations). Limiting physical contact during visitation is reasonably related to maintaining order, security and decorum in the visitation room, as well as the comfort of other visitors and guards.  It is not this court's job nor the jury's job to determine what kind of touching should be allowed during prison visits.  Drawing that line is left to prison administrators.

The plaintiff also argues that he and his wife were entitled to a pre-deprivation hearing before the permanent visitation restriction was put in place.  "[T]he due process clauses do not confer a right to a predeprivation hearing in every case in which a public officer deprives an individual of liberty or property."  *Holly v. Woolfolk*, 415 F.3d 678, 680 (2005).  The court assumes arguendo that a permanent visitation restriction based on a disciplinary charge amounts to a constitutional deprivation to which procedural due process attaches.  Here, Firkus had a legitimate interest in preventing further violation of the visiting rules.  He did not have to wait until the disciplinary hearing was held to do so.  The plaintiff did receive his procedural due process in a post-deprivation hearing on the ticket just days after the institution of the restriction, which was adequate to protect his interests.

The plaintiff also makes an Eighth Amendment challenge to the restriction. He argues that the permanent restriction by Firkus was grossly disproportionate to the infraction, a hickey. The Supreme Court noted in *Overton*:

> Michigan, like many other States, uses withdrawal of visitation privileges for a limited period as a regular means of effecting prison discipline. This is not a dramatic departure from accepted standards for conditions of confinement. *Cf. Sandin v. Conner*, 515 U.S. 472, 485, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Nor does the regulation create inhumane prison conditions, deprive inmates of basic necessities, or fail to protect their health or safety. Nor does it involve the infliction of pain or injury, or deliberate indifference to the risk that it might occur. *See, e.g., Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). If the withdrawal of all visitation privileges were permanent or for a much longer period, or if it were applied in an arbitrary manner to a particular inmate, the case would present different considerations.

*Overton*, 539 U.S. at 137.

Thus, a permanent visitation restriction that is truly permanent, with no reasonable chance of being lifted or reviewed, could amount to a constitutional violation depending on the circumstances. Here, though, Firkus' "permanent" visitation restriction could be lifted by the Warden at anytime, 20 Ill. Admin. Code 525.60, and Mrs. Roberts could request a lifting of the restriction six months after it was imposed. Further, the plaintiff was transferred out of Logan about two weeks after the restriction was imposed. After that transfer, it presumably would have been Pontiac's warden, not Firkus, who had the authority to lift the restriction. The plaintiff does not say whether the Pontiac Warden lifted the restriction or whether Mrs. Roberts made a request after six months and, if so, what was the outcome of that request. The plaintiff is currently in Taylorville Correctional Center but does not say whether his wife can visit. The plaintiff did ask for injunctive relief in both of his complaints, but he sought it against Firkus only, not the warden of the prison in which he was incarcerated.

On the other hand, the defendants also do not give any information on the actual length of the restriction, whether any attempts were made to lift it, how those attempts were handled, or whether the plaintiff is allowed visitation with his wife currently. If the restriction is still in force, then the plaintiff has not been allowed to visit with his wife for three years. Further development of the record is necessary to determine whether a claim lies. Accordingly, Firkus will remain in at this point.

IT IS THEREFORE ORDERED THAT :

1) The defendants' motion for summary judgment is granted in part and denied in part (d/e 55):

    a)    Summary judgment is granted in favor of Defendants Treuthart, Miller, Mooreland, Newlyn, Harper, Gettleman, Cooper and Hopkins on all claims.

    b)    Summary judgment is granted in favor of Defendant Firkus on all the plaintiff's claims of retaliation and the plaintiff's claims challenging the imposition of the 90 day visitation restriction and the initial imposition of the permanent visitation restriction with his wife in 2005.

    c)    Summary judgment is denied to Defendant Firkus in his individual capacity to the extent the plaintiff claims that: Defendant Firkus had the power to restore or effect the restoration of visitation privileges after the plaintiff's transfer out of Logan Correctional Center in 2005 and failed to do so.

    d)    Summary judgment is denied to Defendant Firkus in his official capacity to the extent the plaintiff seeks injunctive relief and Firkus has the power to grant it.

2) Defendant Firkus may move for summary judgment on the remaining claims against him by July 7, 2008.

3) The plaintiff is directed to inform the court, by June 30, 2008, what injunctive claims remain, if any. If the plaintiff fails to respond, the court will assume that injunctive relief is no longer sought. If the plaintiff still seeks injunctive relief (visitation with his wife), the warden of the plaintiff's current place of incarceration will likely need to be joined as a party.

Entered this 28th Day of May, 2008.

                                    **s\Harold A. Baker**

                                  HAROLD A. BAKER
                        UNITED STATES DISTRICT JUDGE